# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDY BROUSSEAU, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>ARCTIC GLACIER U.S.A., INC.,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff Andy Brousseau ("Plaintiff"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, brings this class action against Defendant Arctic Glacier U.S.A., Inc. ("Arctic" or "Defendant"), and alleges the following upon personal knowledge (as to Plaintiff's own actions) and an investigation by counsel, and information and belief as to all other matters.

## INTRODUCTION

1.      The release, disclosure, and publication of sensitive, personal information can be devastating. Not only is it an intrusion of privacy, but it is a harbinger of identity theft.

2.      This class action arises out of a recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly sensitive personal information of an unknown number of individuals from Defendant's computer network (the "Data Breach").

3.      During the regular course of conducting its daily business, Arctic acquires, collects, stores, and transfers customer and employee PII. Arctic acquired Plaintiff's and other similarly situated individuals' ("Class Members") PII during employment and/or while providing products and services.

4.      Plaintiff and Class Members are current and former customers, employees, and other affiliated persons of Arctic, who provided their sensitive PII to Arctic directly or indirectly.

5.      According to reports, in July 2025 the notorious Qilin ransomware gang confirmed it obtained sensitive company data, staff details, and other private information from Defendant through an attack on Defendant's systems, which it posted on the Qilin blog.

6.      The personal information obtained during the Data Breach presumably includes customer and employee names, dates of birth, drivers' license information, government issued IDs, financial information, Social Security numbers (SSN), and other sensitive information (collectively, "PII"). Indeed, Qilin posted screenshots of copies of passports and driver's licenses, staff remuneration data, and several legal and financial documents in its leak.

7.      To date, Arctic has failed to provide important details about the Data Breach and give impacted persons notice. Public reporting has confirmed that the compromised information was held for ransom and either is or will be available on the dark web given Qilin's involvement.

8.      Arctic has not disclosed how it discovered the Data Breach, the means and mechanism of the cyberattack, and, importantly, what specific steps Arctic took following the Data Breach to secure its systems and prevent future cyberattacks.

9.      Because cyberattacks targeting large companies are ubiquitous, it was foreseeable that Arctic would be the target of a cyberattack, and it should have taken appropriate precautions.

10.     The Data Breach was a direct result of Arctic's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII from the foreseeable threat of a cyberattack.

11.     By being entrusted with Plaintiff's and Class Members' PII for its own pecuniary benefit, Arctic assumed a duty to Plaintiff and Class Members to implement and maintain

reasonable and adequate security measures to protect their PII against unauthorized access and disclosure. Arctic also had a duty to adequately safeguard this PII under applicable law, as well as pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act ("FTC Act"). Arctic breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices.

12.     Cybercriminals can use or sell stolen PII to further harm Plaintiff and Class Members in a variety of ways including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' PII to target other phishing and hacking intrusions; using Class Members' PII to obtain government benefits; and otherwise assuming Class Members' identities.

13.     Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its systems were protected against unauthorized intrusions; failing to disclose that it did not have adequate practices and policies in place to safeguard PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to train its staff and employees adequately on proper security measures; and failing to provide Plaintiff and Class Members with prompt and adequate notice of the Data Breach.

14.     Arctic's failure to notify the victims of its Data Breach in a timely manner meant that Plaintiff and Class Members were and remain unable to take quick action to prevent or mitigate the resulting harm.

15.     Despite having been accessed and acquired by unauthorized criminal actors, Plaintiff's and Class Members' sensitive and confidential PII remains in Defendant's possession. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

16.     As a result of the Data Breach, Plaintiff and Class Members have suffered concrete harm and are now exposed to a heightened and imminent risk of fraud and identity theft for a period of years, if not decades. Furthermore, Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft, at their own expense. Consequently, Plaintiff and the other Class Members will incur ongoing out-of-pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17.     Plaintiff and Class Members also will be forced to expend additional time to review credit reports and monitor their financial accounts for fraud or identity theft. Moreover, because the exposed information reportedly includes drivers' license information and passports, and other sensitive documents and immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

18.     Through this action, Plaintiff, individually and on behalf of Class Members, seeks to hold Defendant responsible for the harms caused by the Data Breach. Plaintiff seeks remedies for Defendant's negligence, negligence per se, breaches of fiduciary duty, unjust enrichment, breaches of implied contract, for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and for declaratory and injunctive relief, including actual and statutory damages, restitution, and injunctive and declaratory relief; attorneys' fees, costs, and expenses incurred in bringing this action; and all other remedies the Court deems just and proper.

## PARTIES

### Plaintiff

19.     Plaintiff Andy Brousseau is a resident and citizen of Hawthorn Woods, Illinois. He was employed by Artic between April 2021 and March 2022. Plaintiff's PII was provided to Arctic in connection with Mr. Brousseau's prior employment.

20.     At the time of the Data Breach, Arctic retained Plaintiff's PII in its systems, and on information and belief it continues to retain that information.

21.     Upon learning of the Data Breach, Plaintiff made reasonable efforts to mitigate its impact, including, but not limited to, monitoring various financial and banking accounts for fraudulent activity and fielding spam emails and calls daily.

22.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years.

23.     In the time following the Data Breach, Plaintiff has experienced an increase in spam emails and calls.

24.     Plaintiff also suffered actual injury from having PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential PII—a form of property that was entrusted to Arctic and was compromised as a result of the Data Breach Arctic failed to prevent, and (b) a violation of Plaintiff's privacy rights as a result of unauthorized disclosure of her PII.

25.     Plaintiff has and is continuing to experience fear, stress, frustration, and anxiety, among other issues, because Arctic disclosed his PII to unauthorized parties who may now use that information for improper and unlawful purposes.

26.     Plaintiff is exposed, and will continue to be exposed for the remainder of his life, to imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from his PII being obtained by unauthorized third parties and/or cybercriminals.

27.     Plaintiff is also at a continued risk of harm because, on information and belief, his PII remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack, so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

28.      Plaintiff has a continuing interest in ensuring that his PII, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and cybersecurity risks.

**Defendant**

29.     Upon information and belief, Defendant Arctic Glacier U.S.A., Inc. is a Delaware corporation with a registered office address and principal places of business located at One Bala Plaza, Suite 622, Bala Cynwyd, Pennsylvania 19004.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because: (i) the amount in controversy exceeds $5 million, exclusive of interest and costs; (ii) the number of Class Members exceeds 100; and (iii) minimal diversity exists because many Class Members, including Plaintiff, have different citizenship from Defendant.

31.     This Court has personal jurisdiction over Arctic because it resides in and conducts substantial business in Pennsylvania and in this District through its registered and/or principal place of business; engaged in the conduct at issue from and within this District; and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

32.     Venue is proper under 28 U.S.C. § 1391(a) and (b) because Arctic's registered and/or principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District.

## GENERAL ALLEGATIONS

### *Overview of Arctic Glacier and Its Collection of PII*

33.     Founded in 1882 in Canada, Arctic Glacier entered the American market in 1997. It is one of the largest producers and providers of packaged and crushed ice products in the United States and Canada, servicing major brands and convenience stores where packaged ice is sold.

34.     Defendant's website touts that Arctic Glacier is "the premier provider of high-quality, premium ice products serving North America. For over 140 years the company has perfected the art of ice making, best-in-class service, food safety, and reliable logistics. Arctic Glacier produces and delivers over two billion pounds of ice annually to more than 75,000 customer locations across the U.S. and Canada and employs thousands of Associates from locations across North America." It reportedly operates over 100 distribution centers in North America alone and enjoyed revenue approaching $300 million in 2024.

35.     As a regular and necessary part of its business, Arctic collects and maintains sensitive PII from its customers and the employees it hires, which it obtains and uses in connection with its operations and completing transactions. On information and belief, that information includes, but is not limited to, names, dates of birth, drivers' license information, government issued IDs, financial information, SSNs, and other sensitive information. Arctic stores this information digitally.

36.     Arctic is and was aware of the sensitive nature of the PII it collects, and it acknowledges the importance of data privacy. Indeed, in its Privacy Policy on its website, Arctic

claims that it "respects your right to privacy," acknowledges that "[p]rivacy is of great concern" to individuals, and acknowledges that it is "acutely aware of and sensitive to the privacy concerns of our customers . . . ."[1]

37.      Upon information and belief, Defendant promises its customers, employees, and other affiliated persons, including Plaintiff and Class Members, to keep PII private; comply with industry standards related to data security and PII, including FTC guidelines; inform consumers of its legal duties and comply with all federal and state laws protecting consumer PII; only use and release PII for approved purposes; and provide adequate notice to individuals if their PII is disclosed without authorization. Based on its promises, Plaintiff and Class Members reasonably expected that Arctic would do these things.

38.      By obtaining, collecting, using, and benefitting from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties that required it to, at a minimum, implement adequate safeguards to prevent unauthorized use or disclosure of PII and to report any unauthorized use or disclosure of PII.

39.      Contrary to Defendant's representations, acknowledgments, and responsibilities, it failed to implement adequate data security measures, as evidenced by Defendant's admission of the Data Breach.

### *The Data Breach*

40.      In July 2025, reports began surfacing that Arctic was exposed to a data security incident at the hands of the notorious ransomware gang called Qilin.

41.      Qilin ransomware gang's profile has risen in the last year. In operation since 2022, reports indicate it has ramped up its volume of attacks in 2025, targeting 68 entities in April alone.

---

[1] *Privacy Policy*, Arctic Glacier Premium Ice,
https://arcticglacier.com/Privacy%20Policy/ (last visited Aug. 1, 2025).

42.    On July 22, 2025, Qilin announced a cyberattack on Artic and threatened to release sensitive data unless negotiations were had (i.e., a ransom paid).[2] Qilin reportedly stated that "[t]he full leak will be published soon, unless a company representative contacts us via the channels provided."[3]

43.    Artic Glacier's breach was posted on the Qilin blog, which claimed that Qilin obtained sensitive company data, staff details, and other sensitive information.[4] A screenshot displaying the posting on Qilin's website is below[5]:



44.    Qilin shared several screenshots of the supposedly stolen PII. The leaked information reportedly includes copies of passports and driver's licenses, staff remuneration data, and legal and financial documents.

---

[2] https://www.dexpose.io/qilin-ransomware-attack-on-arctic-glacier/ (last visited Aug. 1, 2025).
[3] *Id.*
[4] https://cybernews.com/security/arctic-glacier-data-breach-claims/ (last visited Aug. 1, 2025).
[5] *Id.*

45.    To date Defendant does not appear to have issued notices, notified state attorneys general, or publicly commented on the Data Breach.

46.    To date, there has been no explanation or details of the Data Breach provided to the public, Plaintiff and Class Members, who retain a vested interest in ensuring that their PII is not repeatedly exposed to cybercriminals by Defendant.

47.    Upon information and belief, Qilin specifically targeted Defendant based on its status as a major company with enormous amounts of valuable PII—including the PII of Plaintiff and Class Members.

48.    Because of the apparent involvement of a ransomware gang, Plaintiff further believes (and reports seemingly confirm) that their and Class Members' PII has been or soon will be disseminated on the dark web, to be available for purchase. That is the *modus operandi* of cybercriminals, and the Qilin gang has threatened exactly that.[6]

49.    It is evident that unauthorized criminal actors did in fact access Arctic's network and exfiltrated Plaintiff's and Class Members' PII in an attack designed to acquire that sensitive, confidential, and valuable information.

50.    The PII contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have accessed Plaintiff's and Class Members' PII.

51.    As an entity that collects and maintains significant volumes of PII, the targeted attack was a foreseeable risk of which Arctic was aware and knew it had a duty to guard against.

---

[6] https://www.dexpose.io/qilin-ransomware-attack-on-arctic-glacier/ (last visited Aug. 1, 2025).

*Arctic Failed to Follow FTC Guidelines*

52.     The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

53.     Defendant was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for sensitive personal information is an "unfair practice" in violation of the FTC Act.[7]

54.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[8] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

55.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be

---

[7] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

[8] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (October 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

56.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.[9] Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

57.     Arctic failed to properly implement the basic data security practices recommended by the FTC.

58.     Defendant was at all times fully aware of its obligation to protect its customers', employees', and other affiliated persons' PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

59.     Arctic's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

---

[9] *See*, *e.g. In the Matter of LabMD, Inc., A Corp*, No. 9357, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds, LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

### *Arctic Failed to Comply with Standards for Data Security*

60.     In light of the evident threat of cyberattacks seeking PII, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by companies to secure Plaintiff's and Class Members' PII.

61.     Arctic is aware of the importance of safeguarding Plaintiff's and Class Members' PII, and that by virtue of its business, it placed Plaintiff's and Class Members' PII at risk of being targeted by cybercriminals.

62.     Because Arctic failed to implement, maintain, and comply with necessary cybersecurity requirements, it was unable to protect Plaintiff's and Class Members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality.

63.     Several best practices have been identified that, at a minimum, should be implemented by corporate entities like Defendant, including, but not limited to: educating all employees; strong passwords; multi-layer security, such as firewalls and anti-virus and anti-malware software; encryption (e.g., making data unreadable without a key); multi-factor authentication; backup data; and limiting the number of employees with access to sensitive data.

64.     Other commonly accepted data security standards among businesses that store personal information, such as the PII involved here, include, but are not limited to:

      a.   Maintaining a secure firewall configuration;

      b.   Monitoring for suspicious or irregular traffic to servers;

      c.   Monitoring for suspicious credentials used to access servers;

      d.   Monitoring for suspicious or irregular activity by known users;

      e.   Monitoring for suspicious or unknown users;

    f.   Monitoring for suspicious or irregular server requests;

    g.   Monitoring for server requests for personal and financial information;

    h.   Monitoring for server requests from VPNs; and

    i.   Monitoring for server requests from Tor exit nodes.

65.    Defendant failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

66.    These frameworks are existing and applicable industry standards in the corporate sector and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

67.    Despite Defendant's obligations, Defendant failed to appropriately monitor and maintain its data security systems in a meaningful way so as to prevent the Data Breach.

68.    Had Defendant properly maintained its systems and adequately protected them, it could have prevented the Data Breach.

### *Arctic Owed a Duty to Safeguard PII, and It Breached That Duty*

69.    Arctic was aware of the importance of security in maintaining personal information (particularly sensitive personal information like the PII involved here), and the value consumers and employees place on keeping their PII secure.

70.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and

requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and Class Members.

71.    Defendant owed a duty to Plaintiff and Class Members, who entrusted Defendant with extremely sensitive PII to design, maintain, and test the information technology systems that housed Plaintiff's and Class Members' PII, to ensure that the PII in Defendant's possession were adequately secured and protected.

72.    Defendant owed a duty to Plaintiff and Class Members to adequately train its employees and others with access to Plaintiff's and Class Members' PII on the procedures and practices necessary to safeguard such sensitive information. This duty also required supervision, training, and compliance on Arctic's part to ensure that it complied with creating, implementing, and maintaining reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

73.    Defendant owed a duty to Plaintiff and Class Members to implement processes that would enable Defendant to timely detect a breach of its information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

74.    Defendant owed a duty to Plaintiff and Class Members to disclose when and if its information technology systems and data security practices were not adequate to protect and safeguard Plaintiff's and Class Members' PII.

75.    Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of inadequate data security practices.

76.    To date, Defendant has failed to publicly describe the full extent of the Data Breach and notify the affected parties. This demonstrates that Arctic did not properly implement measures

designed to timely detect a data breach of their information technology systems, as required to adequately safeguard Plaintiff's and Class Members' PII.

77.     Arctic breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Arctic's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

-  Failing to adequately protect stored PII;

- Failing to properly monitor its own data security systems for existing intrusions;

- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

- Failing to detect unauthorized ingress into its systems;

- Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

- Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;

- Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

- Failing to adhere to industry standards for cybersecurity as discussed above; and

- Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' private PII.

78.     Arctic negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cybercriminals to access its computer network, which contained unsecured and unencrypted PII.

79.     Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

80.     However, due to Arctic's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and Class Members also lost the benefit of the bargain they made with Arctic.

### The Data Breach Was a Foreseeable Risk, and Arctic Knew Criminals Target PII

81.     The Data Breach was foreseeable and avoidable.

82.     Various governmental bodies have put entities like Defendant on notice of the likelihood of cyberattacks. In a Joint Cybersecurity Advisor, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical infrastructure organizations, such as Defendant, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ransomware and data extortion efforts, including against similar ransomware attacks perpetrated by similar ransomware gangs.[10]

83.     Indeed, cyberattacks have been common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The

---

[10]     *See, e.g, #StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (Feb. 27, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a; *#StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (May 10, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a.

FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[11]

84.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

85.     The Office for Civil Rights ("OCR") also urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[13]

86.     Moreover, in light of recent high profile data breaches at other industry leading companies, Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

87.     Data breaches are preventable. As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "[i]n almost all cases, the data breaches that occurred could have been

---

[11] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[12] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[13] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Department of Health and Human Services (Apr. 22, 2014), https://wayback.archiveit.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

prevented by proper planning and the correct design and implementation of appropriate security solutions."[14] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…" and "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … [a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[15]

88.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches at corporations and industries holding significant amounts of PII, preceding the Data Breach.

89.    Given the wealth of information from the law enforcement concerning the increasing prevalence of cyberattacks, Defendant knew and should have known about its data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiff's and Class Members' PII. Even knowing the risk, Defendant failed to do so.

90.    Defendant was well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to both the owners of the PII and those who would use it for wrongful purposes.

91.    Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[14] Lucy L. Thompson, Data Breach and Encryption Handbook (Lucy Thompson, ed., 2011) https://archive.org/details/isbn_9781604429893/page/28/mode/2up.

[15] *Id.*

92.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

93.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

94.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's servers, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

95.     As a highly sophisticated party that handles sensitive PII, Defendant failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' PII to protect against anticipated threats of intrusion of such information.

96.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of PII preceding the date of the breach.

### *PII Is Inherently Valuable*

97.    PII is a valuable property right.[16] The value of PII as a commodity is measurable.[17] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[18] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[19] Personal data is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

98.    PII can sell for as much as $363 per record according to the Infosec Institute.[20] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

99.    PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic

---

[16] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible..."), https://www.researchgate.net/publication/283668023.

[17] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[18] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 at 4, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[19] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[20] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

value." The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to the criminal underworld.

100.    There is an active and robust market for this information. As John Sancenito, president of Information Network Associates, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

101.    As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, driver's license numbers, other ID numbers, SSNs, PII, and other sensitive information directly on various websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

102.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[21]

103.    PII, like that stolen from Defendant, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on

---

[21] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[22]

### *Plaintiff and Class Members Suffered Harm as a Result of the Data Breach*

104.    Identity theft is the most common consequence of a data breach—it occurs to 65% of data breach victims.[23] Consumers lost more than $56 billion to identity theft and fraud in 2020, and over 75% of identity theft victims reported emotional distress.[24]

105.    Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[25]

106.    Identity thieves use PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[26]

107.    With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, obtaining

---

[22] *See* n. 26, *supra.*

[23] Eugene Bekker, *What Are Your Odds of Getting Your Identity Stolen?*, IDENTITYFORCE BLOG (Apr. 14, 2021), https://www.identityforce.com/blog/identity-theft-odds-identity-theft-statistics.

[24] *Id.*

[25] Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft

[26] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[27]

108.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[28]

109.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or SSN. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[27] *Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Sept. 5, 2024).

[28] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

110.    PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use the information and trade it on dark web black-markets for years to come.

111.    For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

112.    The PII presumably exposed in the Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial.

113.    Theft of drivers' license numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced.

114.    Due to their highly sensitive nature, theft of drivers' license numbers in combination with other PII (e.g., name, address, date of birth) can result in a variety of fraudulent activity.

115.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected for weeks or months.

116.    According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

---

[29] *Id.*

117.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:



118.    It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

119.    Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[30] The Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

---

[30] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

120.    As a result of Arctic's conduct and failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII, which allowed the Data Breach to occur, Plaintiff's and Class Members' PII has been and is now in the hands of unauthorized individuals and third parties, which may include thieves, unknown criminals, and other potentially hostile individuals.

121.    Plaintiff and Class Members greatly value their privacy, especially their PII. They would not have entrusted Arctic with their PII had they known that it would fail to adequately protect it. Indeed, Plaintiff and Class Members provided Arctic with this highly sensitive information with the expectation that Arctic would keep their PII secure and inaccessible from unauthorized parties.

122.    As a result of Arctic's failure to implement and follow even the most basic security procedures, Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including, but not limited to the following:

    a.   Trespass, damage to, and theft of their personal property, including PII;

    b.   Improper disclosure of their PII;

    c.   The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;

    d.   The imminent and certainly impending risk of having their confidential PII used against them by spam callers to defraud them;

    e.   Damages flowing from Defendant's untimely notification of the Data Breach;

    f.   Loss of privacy suffered as a result of the Data Breach;

g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' PII for which there is a well-established and quantifiable national and international market;

i.  The loss of use of and access to their credit, accounts, and/or funds;

j.  Damage to their credit due to fraudulent use of their PII; and

k.  Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

123.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives.

124.    Plaintiff and Class Members are also at a continued risk of harm because their PII remains in Arctic's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Arctic fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

125.    Plaintiff and Class Members further face substantial risk of being targeted for phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' PII, as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

126.    Plaintiff and Class Members further have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-

pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

    b.  Purchasing credit monitoring and identity theft prevention;

    c.  Placing "freezes" and "alerts" with reporting agencies;

    d.  Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their names;

    e.  Contacting financial institutions and closing or modifying financial accounts; and

    f.  Closely reviewing and monitoring insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

127.    As a result of the Data Breach, and in addition to the time Plaintiff and Class Members have spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff and Class Members have also suffered emotional distress from the public release of their PII, which they believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the fear that unauthorized bad actors are viewing, selling, and or using their PII for the purposes of identity theft and fraud.

128.    Additionally, Plaintiff and Class Members have suffered damage to and diminution in the value of their highly sensitive and confidential PII —a form of property that Plaintiff and Class Members entrusted to Arctic, and which was compromised as a result of the Data Breach Arctic failed to prevent. Plaintiff and Class Members have also suffered a violation of their privacy rights as a result of Arctic's unauthorized disclosure of their PII.

129.    Many failures laid the groundwork for the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cybersecurity training, procedures, and protocols that were necessary to protect Plaintiff's and Class Members' PII.

130.    Defendant maintained the PII in an objectively reckless manner, making the PII vulnerable to unauthorized disclosure.

131.    Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would result if Plaintiff's and Class Members' PII were stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of the breach.

132.    The risk of improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and Defendant was on notice that failing to take necessary steps to secure Plaintiff's and Class Members' PII from that risk left the PII in a dangerous condition.

133.    Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their PII was protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members with prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

134.    Plaintiff brings this case individually and, pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following classes (collectively the "Class"):

> **Nationwide Class**
> All residents of the United States whose PII was compromised in the Arctic Data Breach, including all persons who receive notice of the Data Breach.

In the alternative to the Nationwide Class, Plaintiff seeks to represent the following class of Illinois residents:

> **Illinois Class**
> All residents of Illinois whose PII was compromised in the Arctic Data Breach, including all persons who receive notice of the Data Breach.

135.    Excluded from the Class is Arctic, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Arctic has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

136.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

137.    <u>Numerosity:</u> The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. On information and belief, many thousands of Class members were impacted by the Data Breach. The exact size of the Class and the identities of the individual members thereof are

ascertainable through Defendant's records, including, but not limited to, the information implicated in the Data Breach.

138.    <u>Commonality and Predominance:</u> There is a well-defined community of interest and there are common questions of fact and law affecting Class Members. The questions of fact and law common to the Class predominate over questions which may affect individual members and include the following:

        a.      Whether and to what extent Defendant had a duty to secure and protect the PII of Plaintiff and Class Members;

        b.      Whether Defendant was negligent in collecting and disclosing Plaintiff's and Class Members' PII;

        c.      Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

        d.      Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

        e.      Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

        f.      Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII in the manner alleged herein, including failing to comply with industry standards;

        g.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.      Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

i.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

j.      Whether Plaintiff and Class Members are entitled to declaratory judgment under 28 U.S.C. § 2201, *et seq.*;

k.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conducts; and

l.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

139.    Typicality: Plaintiff's claims are typical of the claims of Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiff and Class Members each had their PII disclosed by Defendant to an unauthorized third party.

140.    Adequacy: Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class Members. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class Members and has no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, including data breach litigation. Plaintiff's counsel are arguably the most experienced data privacy lawyers in Philadelphia with the most appointments in data privacy cases brought in Philadelphia. The claims of Plaintiff and Class Members are substantially identical as explained above. While the aggregate damages that

may be awarded to the Class Members are likely to be substantial, the damages suffered by the individual Class Members are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Certifying the case as a class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class. Defendant's uniform conduct is generally applicable to the Class as a whole, making relief appropriate with respect to each Class Member.

141.    <u>Superiority:</u> Here a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting damages in the aggregate would go unremedied.

142.    <u>Ascertainability:</u> Finally, all Class members are readily ascertainable. Defendant has access to the names and addresses of Class Members affected by the Data Breach.

## CAUSES OF ACTION

## COUNT I

### NEGLIGENCE

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Illinois Class)**

143.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    Plaintiff pleads this claim on behalf of the Nationwide Class or, alternatively, on behalf of the Illinois Class under Illinois law.

145.    Arctic owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

146.    Arctic knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. Arctic knew, or should have known, of the vast uptick in data breaches in recent years. Arctic had a duty to protect the PII of Plaintiff and Class Members.

147.    Given the nature of Arctic's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Arctic should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which Arctic had a duty to prevent.

148.    Arctic breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect the PII entrusted to them—including Plaintiff's and Class Members' PII.

149.    It was reasonably foreseeable to Arctic that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt,

implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

150.    But for Arctic's negligent conduct/breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

151.    As a result of Arctic's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft— risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation and diminution in the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

### COUNT II
### NEGLIGENCE PER SE
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Illinois Class)**

152.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    Plaintiff pleads this claim on behalf of the Nationwide Class or, alternatively, on behalf of the State Classes under the laws of those states.

154.    In addition to the common law, Arctic's duties arise from Section 5 of the FTC Act,

36

15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Arctic, of failing to employ reasonable measures to protect and secure PII.

155.    Arctic violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and not complying with applicable industry standards. Arctic's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

156.    Arctic's violations of Section 5 of the FTC Act constitutes negligence per se.

157.    Plaintiff and Class Members are within the class of persons that Section 5 of the FTC Act was intended to protect.

158.    The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTC Act was intended to guard against.

159.    It was reasonably foreseeable to Arctic that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

160.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Arctic's violations of Section 5 of the FTC Act. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—

37

risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation and diminution in the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Illinois Class)**

161.    Plaintiff reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

162.    Plaintiff pleads this claim on behalf of the Nationwide Class or, alternatively, on behalf of the State Classes under the laws of those states.

163.    Plaintiff and Class Members gave Arctic their PII in confidence, believing that Arctic would protect that information. Plaintiff and Class Members would not have provided Arctic with this information had they known it would not be adequately protected. Arctic's acceptance and storage of Plaintiff's and Class Members' PII created a fiduciary relationship between Defendant and Plaintiff and Class Members. In light of this relationship, Arctic must act reasonably to safeguard the PII with which it was entrusted.

164.    Arctic breached that fiduciary duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII, failing to comply with the data security guidelines set forth by Section 5 of the FTC Act, and otherwise failing to safeguard the PII of Plaintiff and Class Members it collected.

165.    As a direct and proximate result of Arctic's breaches of its fiduciary duties,

Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Arctic's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

<u>**COUNT IV**</u>

**UNJUST ENRICHMENT**

**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the Illinois Class)**

166.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

167.    Plaintiff pleads this claim on behalf of the Nationwide Class or, alternatively, on behalf of the Illinois Class.

168.    This claim is pleaded in the alternative to the implied contract claim pursuant to Fed. R. Civ. P. 8(d)(2).

169.    Plaintiff and Class Members conferred a monetary benefit upon Arctic in the form of monies paid for educational services or other services.

170.    Arctic accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Arctic also benefited from the receipt of Plaintiff's and Class Members' PII.

171.    As a result of Arctic's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members

paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

172.    Arctic should not be permitted to retain the money belonging to Plaintiff and Class Members because Arctic failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, local laws, and industry standards.

173.    Arctic should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V

## BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the State Classes)**

174.    Plaintiff reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

175.    Plaintiff plead this claim on behalf of the Nationwide Class or, alternatively, on behalf of the Illinois Class.

176.    Artic required Plaintiff and Class Members to provide their PII as a condition of their employment. In exchange, Arctic entered into implied contracts with Plaintiff and Class Members in which Arctic agreed to comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

177.    Plaintiff and Class Members would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

178.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

179.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

180.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of their implied contracts with Plaintiff and Class Members.

**COUNT VI**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("CFA"),**
**815 Ill. Comp. Stat. §§505/1, *et seq.***
**(On Behalf of Plaintiff and the Illinois Class)**

181.    Plaintiffs realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. This claim is asserted on behalf of the Illinois Class only.

182.    Plaintiffs and the Illinois Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiff, the Illinois Class, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

183.    Artic is engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendant engages in the sale of "merchandise" (including services" as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

184.    Artic engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (1) failing to maintain adequate data security to keep Plaintiffs' and the Illinois Class's sensitive Private Information from being stolen by

cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including HIPAA and the FTC act; (2) failing to disclose or omitting material facts to Plaintiff and the Illinois Class regarding its lack of adequate data security and inability or unwillingness to properly secure and protect the Private Information of Plaintiff and the Illinois Class; (3) failing to disclosure or omitting material facts to Plaintiff and the Illinois Class about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Private Information of Plaintiff and the Illinois Class; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff and the Illinois Class's Private Information and other personal information from further unauthorized disclosure, release, data breaches, and theft.

185.    These actions also constitute deceptive and unfair acts or practices because Artic knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff and the Illinois Class and defeat their reasonable expectations about the security of their PII and PHI.

186.    Defendant intended that Plaintiff and the Illinois Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts.

187.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Illinois Class. Plaintiff and the Illinois Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

188.    Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Illinois Class of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*.

189.    As a result of Defendant's wrongful conduct, Plaintiff and the Illinois Class were injured in that they never would have provided their PII and PHI to Defendant, or paid for Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their PII and PHI from being hacked and taken and misused by others.

190.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiff and the Illinois Class have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments or services made to Defendant that Plaintiff and the Illinois Class would not have made had they known of Defendant's inadequate data security; lost control over the value of their PII and PHI; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII and PHI, entitling them to damages in an amount to be proven at trial. Specifically, Plaintiff experienced fraudulent charges on his debit card and was required to obtain a new one. Plaintiff suffered economic injury because he was unable to make purchases with his debit card while he awaited the replacement card.

191.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Illinois Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

## PRAYER FOR RELIEF

Plaintiff, individually, and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Arctic as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, individually, and on behalf of the Class, seek appropriate injunctive relief designed to prevent Arctic from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft.

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: August 1, 2025                              Respectfully submitted,

                                                   */s Andrew W. Ferich*
                                                   Andrew W. Ferich (PA Bar 313696)
                                                   **AHDOOT & WOLFSON, PC**
                                                   201 King of Prussia Road, Suite 650
                                                   Radnor, PA 19087

Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Alyssa Brown (*pro hac vice* to be filed)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
abrown@ahdootwolfson.com

Benjamin F. Johns (PA Bar 201373)
Samantha E. Holbrook (PA Bar 311829)
**SHUB JOHNS & HOLBROOK, LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Facsimile: (856) 210-9088
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiff and the Proposed Classes*